# IN THE UNITED STATES BANKRUPTCY COURT FOR THE
## SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

|  |  |
|---|---|
| ) | **FILED** |
| In re: ) | **Lucinda B. Rauback, Clerk** |
| ) | **United States Bankruptcy Court** |
| ABUNDANT LIFE WORSHIP CENTER ) | **Savannah, Georgia** |
| OF HINESVILLE, GA, INC., ) | **By cmurray at 2:01 pm, Dec 16, 2020** |
| ) |  |
| *Debtor.* ) |  |
| _____) |  |
| ) | Chapter 11 |
| JBB Holdings, LLC, ) |  |
| ) | Number <u>20-40959-EJC</u> |
| *Movant,* ) |  |
| ) |  |
| v. ) |  |
| ) |  |
| ABUNDANT LIFE WORSHIP CENTER ) |  |
| OF HINESVILLE, GA, INC., ) |  |
| ) |  |
| *Respondent.* ) |  |
| ) |  |
| _____) |  |

## <u>OPINION ON MOTION TO CONFIRM NO STAY IS IN EFFECT</u>

## I. INTRODUCTION

This case involves a long-running dispute between a church, Abundant Life

Worship Center of Hinesville, GA, Inc. (the "Debtor") and its principal creditor, JBB

Holdings, LLC ("JBB"), which holds a first-priority lien on real property consisting

of 40 acres in Liberty County, Georgia, commonly known as 5493 North Coastal Highway, Fleming, Georgia 31309 (the "Property"). Three times in the past 23 months, the Debtor has taken last-minute steps to stop a foreclosure sale by JBB. First, minutes before a scheduled foreclosure, the Debtor filed a Chapter 11 petition in this Court on January 2, 2019, commencing case no. 19-40004-EJC. After that case was dismissed on March 2, 2020, the Debtor filed a Verified Complaint for Preliminary Injunction and Temporary Restraining Order in the Superior Court of Liberty County, Georgia, and obtained a temporary restraining order enjoining a second foreclosure scheduled for March 3, 2020. When that state court litigation was dismissed as to JBB on September 18, 2020, and the injunction lifted, a third foreclosure sale was scheduled for November 3, 2020. The Debtor sought a stay from the state court while it pursued an appeal, but on November 2, 2020, the state court denied the motion for stay. To stop the sale for a third time, the Debtor filed its petition in this case on that same day, November 2, 2020. Believing that the foreclosure sale was not subject to the automatic stay, JBB held the sale on the courthouse steps in Hinesville, Georgia. JBB submitted the high bid and obtained a signed deed conveying the Property to JBB but has not yet recorded that deed and asserts it will not do so until this Court rules that no stay came into effect under 11 U.S.C. § 362(n)(1)(B).

Pending before the Court are JBB's Motion to Confirm the Automatic Stay Under 11 U.S.C. § 362(a) Does Not Apply to Debtor's Second Small Business Debtor Case Pursuant to 11 U.S.C. § 362(n)(1)(B) (the "Motion to Confirm No Stay is in Effect") (2020 dckt. 7)[1] and its supplemental motion requesting the same relief. (2020 Dckt. 96). JBB's motion came on for hearing on November 30, 2020. On the eve of that hearing, on November 29, 2020, the Debtor filed an amended petition electing to proceed under Subchapter V of Chapter 11. (2020 Dckt. 58). At the hearing on JBB's motion, the Court heard testimony from two witnesses, and the parties stipulated that the Court could take judicial notice of all filings on its docket in both the 2019 case and the pending case, including all the state court filings attached to the various papers submitted by the parties.[2] At the conclusion of the hearing, the Court took the matter under advisement. The parties have submitted supplemental materials and briefs (2020 dckt. 96, 97, 98), and the matter is now ripe for ruling.

Having reviewed the docket in both this case and the 2019 case, and based on the evidence presented at the November 30, 2020 hearing and the supplemental

---

[1] Docket entries from the 2020 bankruptcy case shall be indicated using this designation.

[2] "[T]he Court can take judicial notice of its own docket as a 'source[] whose accuracy cannot reasonably be questioned.'" *Sciortino v. Gwinnett Cnty. Dep't of Water Res. (In re Sciortino)*, 561 B.R. 260, 271 (Bankr. N.D. Ga. 2016) (quoting Fed. R. Evid. 201(b)(2)). *See also U.S. v. Rey*, 811 F.2d 1453, 1457 n.5 (11th Cir. 1987) ("A court may take judicial notice of its own records[.]").

materials, the Court finds that the automatic stay of § 362(a) did not come into effect upon the Debtor's filing of its petition in this case on November 2, 2020. The Court further finds that the November 29, 2020 election to proceed under Subchapter V did not operate to impose the automatic stay, retroactively or otherwise. Therefore, the Court will enter an Order granting JBB's Motion to Confirm No Stay is in Effect. This Opinion constitutes the Court's findings of fact and conclusions of law. To the extent that any findings of fact herein are construed to be conclusions of law, they are hereby adopted as such. To the extent that any conclusions of law herein are construed to be findings of fact, they are hereby adopted as such.

## II. JURISDICTION

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a), and the Standing Order of Reference signed by then Chief Judge Anthony A. Alaimo on July 13, 1984. This is a "core proceeding" under 28 U.S.C. § 157(b)(2).[3]

---

[3] No party in interest has challenged the justiciability of JBB's Motion to Confirm No Stay is in Effect. Arguably, the relief sought by JBB is in the nature of a comfort order, as discussed in *In re Hill*, 364 B.R. 826, 828 (Bankr. M.D. Fla. 2007). Regardless, the Court finds that this Opinion and the accompanying Order have a valid legal effect and thus do not constitute an impermissible advisory opinion. *See In re Cubic Energy, Inc.*, 587 B.R. 849, 855-56 (Bankr. D. Del. 2018) ("[A]n opinion is not advisory where it actually invalidates a clause, orders a party to do something, or otherwise resolves the parties' litigation.").

## III. FINDINGS OF FACT

A. Organization of the Debtor

The Debtor is a non-denominational congregational church originally formed in 1998 under the name Abundant Life Worship Center, Inc. (2020 Dckt. 92, p. 50).[4] According to the Debtor's filings in this matter, that incorporation was approved not only by its board of directors, but by its membership as well. (2020 Dckt. 36, p. 3). Due to an administrative oversight, however, that corporation was administratively dissolved by the Georgia Secretary of State in 2005. (2020 Dckt. 36, p. 4; 2020 Dckt. 92, p. 50). In 2011, in connection with the loan transaction discussed below, the church was again incorporated, by its bishop, Carroll A. Norwood, under the name Abundant Life Worship Center of Hinesville, GA, Inc. (2020 Dckt. 36, p. 4; 2020 Dckt. 92, pp. 50-51, 62, 64). As addressed below, the Debtor now claims that this 2011 reincorporation was accomplished without the knowledge or approval of the church membership. (2020 Dckt. 35, p. 4).

B. The Loan Transaction and the Debtor's Default

In 2011, the Debtor obtained a loan from United Community Bank to finance the purchase of the Property. (2020 Dckt. 92, pp. 70-71). The principal amount of the original loan was $280,000.00. (2020 Dckt. 94-1; 2020 Dckt. 92, pp. 70-71). Thereafter, the Debtor financed the construction of a church building on the site, and

---

[4] The transcript of the November 30, 2020 hearing appears at this docket entry.

the amount of the loan increased to $1,650,167.00 by 2015. (2020 Dckt. 94-5). Both the land and the church building served as collateral for the loan. Subsequently, the loan was divided into two promissory notes, which were then assigned to JTS Capital, LLC and were later purchased by JBB.[5] In 2018, JBB declared the Debtor in default under the loan transaction, and a foreclosure sale was scheduled for January 2, 2019.[6]

C.   The 2019 Bankruptcy Case[7]

To prevent the foreclosure sale, the Debtor filed a skeletal petition commencing Chapter 11 case no. 19-40004-EJC at 9:54 a.m. on January 2, 2019. (2019 Dckt. 1).[8] Neither the original petition nor an amended petition filed later that same day indicated that the Debtor was a small business as defined in 11 U.S.C. § 101(51D). (2019 Dckt. 1, p. 2; 2019 Dckt. 5, p. 2). On January 16, 2019, the Debtor

---

[5] As the Debtor describes it, "[b]etween 2011 and 2016, the [United Community Bank] loan was extended, renewed, and refinanced, and ultimately split into two (2) loans." (2020 Dckt. 35, p. 1). According to JBB, "in June 2016, [United Community Bank] split the loan into Promissory Note A and Promissory Note B, thereby reducing the monthly payments required to be made by Debtor[.]" (2020 Dckt. 94, p. 2).

[6] At the November 30, 2020 hearing, JBB's managing member, Roger King, testified that it had been "approximately 33 months" since JBB last received a payment from the Debtor. (2020 Dckt. 92, pp. 121-22). This estimate seemingly did not include the $7,500.00 per month in adequate protection the Debtor was required to pay under an interim order entered in the 2019 bankruptcy case on September 17, 2019. (2020 Dckt. 168).

[7] The Court will recount in some detail the proceedings in the 2019 bankruptcy case because they bear on the Debtor's evidentiary burden under 11 U.S.C. § 362(n)(2)(B), as discussed below.

[8] Docket entries from the 2019 case shall be indicated using this designation.

6

moved to employ attorney J. William Boone of James-Bates-Brannan-Groover-LLP, which the Court granted. (2019 Dckt. 15, 26, 30, 33, 53). An amended petition filed on February 27, 2019, indicated that the Debtor *was* a small business under § 101(51D). (2019 Dckt. 56, p. 2). Its debts were within the small business debt limit of § 101(51D),[9] and no party in interest objected to that small business designation.[10]

On May 7, 2019, JBB, as Trustee of the Abundant Life Worship Center Trust 09082017 (the "Trust"), filed its proof of claim in the amount of $2,156,150.58 secured by the Property. (2019 Claim No. 7). One month later, the Debtor appeared to acknowledge its inability to pay the debt to JBB under the terms of the notes. On June 7, 2019, JBB filed its Unopposed (by Debtor) Motion for Relief from the Automatic Stay (the "Consent Motion for Stay Relief") (2019 Dckt. 109). According to that motion, the Debtor and JBB agreed to a settlement whereby the stay would be lifted so that JBB could conduct a foreclosure sale. JBB agreed to waive any deficiency claim against the Debtor or its guarantors. Further, if JBB submitted the highest bid at foreclosure, it would then lease the Property to the Debtor for an initial term of 24 months at a rate of $7,500.00 per month. If JBB did not sell the Property during that 24-month term, then the Debtor could extend the lease for an additional

---

[9] Pursuant to 11 U.S.C. § 104, the § 101(51D) debt limit was adjusted from $2,566,050.00 to $2,725,625 effective April 1, 2019. *Revisions of Certain Dollar Amounts in the Bankruptcy Code Prescribed Under Section 104(a) of the Code*, 84 F.R. 3488 (Feb. 12, 2019). The Debtor was within this debt limit. *See* 2019 Dckt. 59.

[10] *See* Federal Rule of Bankruptcy Procedure 1020(b).

18 months under the same terms. The Debtor would hold a right of first refusal should JBB receive an offer to purchase the Property, but the lease would terminate upon any sale to a third party. (2019 Dckt. 109, pp. 7-8). Consistent with the Consent Motion for Stay Relief, the Debtor filed on June 14, 2019, a Motion for Approval of Compromise and Settlement by and among Abundant Life Worship Center of Hinesville, GA, Inc. and JBB Holdings, LLC (the "Motion to Compromise") setting forth the terms of this agreement. (2019 Dckt. 115, pp. 6-8). A hearing on the Motion to Compromise was scheduled for July 29, 2019. (2019 Dckt. 118).

Before the hearing could take place, however, the Debtor withdrew the Motion to Compromise (the "Withdrawal") on July 12, 2019, stating only that "Debtor … subsequent to a change of composition of members of its Board of Directors, has made a decision to withdraw . . . without prejudice" the Motion to Compromise and the consent order submitted in connection with JBB's Consent Motion for Stay Relief. (2019 Dckt. 125, p. 1). On July 17, 2019, Mr. Boone moved to withdraw from representing the Debtor in the case. (2019 Dckt. 126). In its Motion to Enforce Compromise and Settlement of Claims with Debtor (the "Motion to Enforce Compromise") filed on July 22, 2019, JBB argued that the Debtor was bound by its Board's prior decision to enter into the settlement. (2019 Dckt. 131). JBB further contended that even if the settlement was not enforced, JBB should

8

nevertheless be granted stay relief to commence foreclosure proceedings. (2019 Dckt. 131, p. 7).[11]

On July 29, 2019, a hearing[12] was held on JBB's Consent Motion for Stay Relief, the Debtor's Motion to Compromise, the Withdrawal, and Mr. Boone's motion to withdraw from the case.[13] At that hearing, J. Michael Hall of Hall & Navarro, LLC, appeared on behalf of the Debtor. (2019 Dckt. 150, pp. 3-5). While counsel for JBB argued that the Court should enforce the terms of the settlement, Mr. Hall asserted that valuation of the Property was critical to the issues before the Court and requested a continuance of the Consent Motion for Stay Relief, the Motion to Compromise, and the Withdrawal so that the Debtor could obtain an appraisal.

---

[11] On that same day, July 22, 2019, JBB filed a Motion to Dismiss for Debtor's Post-Petition Actions ("JBB's Motion to Dismiss") alleging that after filing its petition, "the Debtor formed a new corporation and then directed its parishioners to make donations to that new entity," thereby diverting funds from the bankruptcy estate. (2019 Dckt. 132, p. 2). The next day, July 23, 2019, the U.S. Trustee requested that the case be dismissed or converted to Chapter 7 (the "U.S. Trustee's Motion to Dismiss or Convert") based on both the Debtor's "imminent lack of [C]hapter 11 counsel" and its alleged "siphoning of charitable donations to a new entity coupled with the failure to account for [those] funds." (Dckt. 134, pp. 2-3). At the October 24, 2019 hearing, the U.S. Trustee's counsel, Joel Paschke, represented that he no longer sought dismissal or conversion. Mr. Paschke acknowledged that the Debtor, now represented by Mr. Hall, was no longer without counsel. (2019 Dckt. 230, p. 15). He further represented that the alternative charitable organization, mentioned in JBB's Motion to Dismiss, received only *de minimis* contributions that ultimately were used for the Debtor's benefit. (2019 Dckt. 230, pp. 15-16). Accordingly, the Court announced that it would continue indefinitely the U.S. Trustee's Motion to Dismiss or Convert (2019 dckt. 230, p. 16), which was accomplished by a subsequent notice. (2019 Dckt. 220).

[12] A transcript of that hearing appears at 2019 Dckt. 150.

[13] JBB's Motion to Enforce Compromise, which was filed on July 22, 2019, was not noticed for hearing as of July 29, 2019.

(2019 Dckt. 150, pp. 25-28, 62). The Court continued to September 24, 2019, all pending matters other than Mr. Boone's motion to withdraw from the case. (2019 Dckt. 138; 2019 Dckt. 150, pp. 68, 79;). After Mr. Boone's motion was granted orally and memorialized in a subsequent order (2019 dckt. 141), he filed a fee application seeking a total of $148,009.49. (2019 Dckt. 169, 174, 175, 176).

On August 9, 2019, the Debtor filed its application to employ Mr. Hall, which the Court granted. (2019 Dckt. 147, 153). Consistent with Mr. Hall's representations at the July 29, 2019 hearing, the Debtor then filed a Motion to Value Property Pursuant to 11 U.S.C. § 506 (the "Motion for Valuation") requesting that the Court schedule an evidentiary hearing to determine the value of the Property for purposes of the Debtor's Chapter 11 plan. (2019 Dckt. 160). That motion was scheduled for hearing on September 24, 2019 (2019 dckt. 161), but at the Debtor's request the matter was continued to October 24, 2019, along with the other pending motions. (2019 Dckt. 172, 180).[14]

_____

[14] In the midst of these proceedings in the underlying case, on September 17, 2019, the Debtor filed an adversary proceeding, No. 19-04026-EJC, against JBB and four other defendants. (2019 Adv. Dckt. 1, amended at 2019 Adv. Dckt. 23). In the complaint the Debtor alleged, among other things, that JBB was not the owner of the loan documents at the time it demanded full payment of the loan balance in 2018; that it "wrongfully collected payments, demanded payments[,] and represented to the Debtor that it owned the [United Community Bank] Notes"; and that it conspired with certain other defendants to "misle[ad] the Debtor into believing that a refinancing of the debt was in process[.]" (2019 Adv. Dckt. 1, pp. 3-4). The Debtor requested that the Court find, among other things, that JBB's claim was partially unsecured and that the Debtor was entitled to damages against JBB. (2019 Adv. Dckt. 1, pp. 4-5). The Debtor did not sue United Community Bank, did not challenge the validity of its $1.6 million debt to United Community Bank, and did not challenge United Community Bank's assignment of the security deed and notes to a third party. JBB moved to dismiss the Debtor's claims against it (2019 adv. dckt. 6,

On October 15, 2019, the Debtor moved under 11 U.S.C. § 1121(e)(3) to extend the time for filing its disclosure statement and plan, which was due to expire on October 29, 2019 (the "First Motion to Extend Time").[15] (2019 Dckt. 202). Along with the other pending motions, the Debtor's First Motion to Extend Time was likewise scheduled for hearing on October 24, 2019. (2019 Dckt. 206).

At the October 24, 2019 hearing,[16] the Court heard testimony from seven witnesses, six of whom testified as to valuation of the Property, including three expert appraisers whose written reports were all admitted into evidence.[17] After the close of evidence, the Court took under advisement the Debtor's Motion for Valuation. (2019 Dckt. 230, p. 340). The Court also orally granted the Debtor's First Motion to Extend Time (2019 dckt. 230, pp. 87-90), which decision was

---

43), and that motion to dismiss was briefed by the Debtor and JBB. (2019 Adv. Dckt. 56, 57). As will be discussed below, the adversary proceeding was dismissed on January 24, 2020. (2019 Adv. Dckt. 64).

[15] That motion appears on the docket under the title "Motion to Extend Exclusivity Period for Filing a Chapter 11 Plan and Disclosure Statement." (2019 Dckt. 202). As the Court recited at the October 24, 2019 hearing, however, the 180-day *exclusivity* period had already expired, and the Debtor sought only to extend the 300-day deadline for filing a plan and disclosure statement. (2019 Dckt. 230, pp. 89-90).

[16] A transcript of that hearing appears at 2019 Dckt. 230. The exhibit log appears at 2019 Dckt. 219.

[17] As to valuation, the Court heard testimony from appraisers Johnnie Ganem, Robert Driggers, and Paige Couper, from real estate broker Brandon Boyce, from the Debtor's CFO Felicia Delacoudray, and from JBB's managing member Roger King. The Court also heard testimony from a seventh witness, Nelson Lively, as to the history of the loan transaction. (2019 Dckt. 230, pp. 91-169).

memorialized in an order entered the following day. (2019 Dckt. 216). A continued hearing was scheduled for January 23 and 24, 2020, on the Consent Motion for Stay Relief, the Motion to Compromise, the Withdrawal, the Motion to Enforce Compromise, and JBB's Motion to Dismiss. (2019 Dckt. 221).

Mr. Boone's fee application came on for hearing on November 13, 2019. (2019 Dckt. 195). At that hearing, Mr. Boone described his participation in the case, and the Court heard testimony from Dedra Norwood and Pastor Norwood in opposition to Mr. Boone's application. At the request of Debtor's new counsel, the Court continued the matter, first to the previously scheduled January 23-24, 2020 hearing, and then to the same undetermined date as the confirmation hearing. (2019 Dckt. 225, 240).

With the January 27, 2020 deadline to file its disclosure statement and plan approaching, the Debtor filed a Second Motion to Extend Time to File Plan (the "Second Motion to Extend Time") on January 15, 2020.[18] (2019 Dckt. 232). In the motion, the Debtor argued that it would not be able to file a plan before the Court ruled on the value of the Property or before the adversary proceeding was resolved. Therefore, rather than seeking an extension through a date certain, the Debtor requested that "the time period for filing the disclosure statement and plan be

---

[18] As with the First Motion to Extend Time, this motion incorrectly appears on the docket as a motion to extend exclusivity period. (2019 Dckt. 232).

continued until thirty days subsequent to the latest of (a) the entry of a final order on valuation; or (b) the entry of a final judgment of the pending adversary proceeding[.]" (2019 Dckt. 232, p. 3). The Second Motion to Extend Time was set for hearing, on an expedited basis, on January 23-24, 2020. (2019 Dckt. 234).

At the outset of the continued hearing on January 23, 2020, the Court orally announced its findings of fact and conclusions of law on the Debtor's Motion for Valuation. As memorialized in an order entered that same day, the Court found that the value of the Property was $1,900,000.00 as of the petition date. (2019 Dckt. 245). The Court next heard oral argument from JBB's counsel in opposition to the Debtor's Second Motion to Extend Time. After a recess, however, the parties announced that they had again reached a settlement. Under the terms thereof, the Debtor would voluntarily dismiss the bankruptcy case and the adversary proceeding, releasing its claims against JBB, its managing member, and the Trust. The Debtor would have the right to remain on the Property through June 1, 2020, making monthly payments of $7,500.00. The parties recited in some detail other terms of the settlement and agreed to finalize the language of the settlement overnight and to announce terms the following morning.

On the morning of January 24, however, counsel announced that the Debtor had again backed out of the settlement. Instead, the Debtor consented to immediate stay relief as to the Property. The Debtor also announced that it would withdraw its

Second Motion to Extend Time. Consistent with those announcements, later that same day the Debtor withdrew its motion (2019 dckt. 249), JBB's Consent Motion for Stay Relief was granted (2019 dckt. 250), and the adversary proceeding was dismissed. (Adv. Dckt. 64). The Court also continued indefinitely the Motion to Compromise, the Withdrawal, the Motion to Enforce Compromise, and JBB's Motion to Dismiss. (2019 Dckt. 253).

On January 28, 2020, JBB moved to dismiss the case based on the Debtor's failure to timely file a disclosure statement or plan under § 1121(e). (2019 Dckt. 256). The following day, January 29, 2020, the U.S. Trustee likewise moved for dismissal for the same reason. (2019 Dckt. 258). Mr. Hall filed his final fee application seeking a total of $84,643.03 for the period July 26, 2019, through February 19, 2020. (2019 Dckt. 273, 274). Following a February 25, 2020 hearing on these matters, the Court granted the fee applications of both Mr. Boone and Mr. Hall (2019 dckt. 280, 281), and the case was dismissed on March 2, 2020, based on the Debtor's failure to timely file a disclosure statement and plan. (2019 Dckt. 284).

D. The 2020 State Court Litigation

After JBB received stay relief on January 24, 2020, in the 2019 bankruptcy case, it began advertising for a March 3, 2020 foreclosure sale. As recited in the Debtor's filings in this case,[19] however, on March 2, 2020, the Debtor filed a

_____

[19] *See* 2020 Dckt. 35, p. 3.

Verified Complaint for Preliminary Injunction and Temporary Restraining Order in the Superior Court of Liberty County, Georgia, and a motion seeking the same. (2020 Dckt. 77-1, pp. 5-9). In its complaint, the Debtor argued for the first time that the defendants "failed to comply with Georgia State Law and the law governing congregational churches under U.S. Supreme Court ruling [sic] in securing a lawful encumbrance against" the Property. (2020 Dckt. 77-1, p. 6). The Debtor elaborated on this argument in its accompanying brief, stating that the church's members "never voted on or approved any of the underlying loans,[20] mortgages, forbearance agreements, or any sort of encumbrance . . . whatsoever." (2020 Dckt. 57-1, p. 8).

On the same day the complaint was filed, March 2, 2020, Judge Robert L. Russell, III, issued a temporary restraining order enjoining JBB from proceeding with the foreclosure sale scheduled for the following day. (2020 Dckt. 35, p. 3). On March 11, 2020, JBB moved to dismiss the Debtor's complaint. (2020 Dckt. 57-2, pp. 1-19). JBB argued, among other things, that Georgia law did not require congregational approval to encumber the Property, that the loan transaction could not be set aside as an *ultra vires* act of Bishop Norwood, and that the Debtor ratified the loan by using the proceeds to acquire the real property and to build the church thereon. (2020 Dckt. 57-2, pp. 14-18).

---

[20] As with the adversary proceeding (2019 Adv. Dckt. 1, 23), the Debtor did not name United Community Bank as a defendant in the state court action.

The Debtor amended its complaint on August 2, 2020. (2020 Dckt. 77-1, pp. 10-28). In its amended complaint, the Debtor for the first time claimed that its 2011 *incorporation* was also unauthorized, alleging the following:

> Carroll Norwood ("Norwood"), who is not a party to this case, was the incorporator of [the Debtor] and was a Pastor at [the Debtor] for many years. There was never an authorization of the "incorporation" of [the Debtor] by the congregation therefore the purported incorporation was in effect a sham.
>
> . . .
>
> Mr. Norwood and third party individuals associated with [the Debtor] entered contracts purportedly on behalf of the [the Debtor] without the members['] knowledge, approval or consent. Several of the contracts involve the Defendants in this matter.

(2020 Dckt. 77-1, pp. 13-14). Based on these allegations, the Debtor requested "a declaration that the church government, its members, did not give authority [b]y majority vote to Carroll Norwood or any other affiliated third parties and therefore he . . . had no authority to bind the [Debtor] to the agreements with Defendants or others" and that "absent authority the [Debtor] was [sic] not entered into any contracts with Defendants or others concerning the Subject Property." (2020 Dckt. 77-1, p. 14).

A hearing on JBB's motion to dismiss was held on August 3, 2020. (2020 Dckt. 35, p. 3). On September 18, 2020, Judge Russell issued an order granting JBB's motion to dismiss and lifting the injunction on the foreclosure proceedings.

(2020 Dckt. 57-3). Judge Russell found that the Debtor was subject to the Georgia Nonprofit Corporation Code and, as such, lacked "standing to challenge actions authorized by its own directors or purported directors." (2020 Dckt. 57-3, p. 6). He further found that the Debtor could not set aside Bishop Norwood's actions as *ultra vires* (2020 dckt. 57-3, pp. 6-7) and that the Debtor ratified the loan transaction. (2020 Dckt. 57-3, pp. 7-11).

On October 7, 2020, JBB began advertising a November 3, 2020 foreclosure sale in Liberty County's paper of record, the *Coastal Courier*. (2020 Dckt. 35, p. 3; 2020 Dckt. 92, p. 63). Thereafter, on October 16, 2020, the Debtor filed a notice of appeal of Judge Russell's order in the Supreme Court of Georgia. (2020 Dckt. 35, p. 3). On October 29, 2020, the Debtor filed an emergency motion requesting that Judge Russell stay dismissal of the injunction pending resolution of the appeal. (2020 Dckt. 60-1). JBB filed a response in opposition on November 2, 2020. (2020 Dckt. 57-4). On that same day, Judge Russell denied the Debtor's emergency motion, finding that the Debtor was "not likely to prevail on appeal" and that "any further delay would be a substantial burden on [JBB's] interest." (2020 Dckt. 57-5, pp. 1-2).

E.  The 2020 Bankruptcy Case

In its third attempt to stave off foreclosure, the Debtor, now represented by Tacita A. Mikel Scott, filed a skeletal petition commencing its second Chapter 11

case at 7:59 p.m. on November 2, 2020. (2020 Dckt. 1). As in the 2019 case, the petition indicated that the Debtor is a small business debtor under § 101(51D). (2020 Dckt. 1, p. 2). Notably, the Debtor did not check the box to proceed under Subchapter V of Chapter 11. (2020 Dckt. 1, p. 2). Notwithstanding the Debtor's second bankruptcy petition, JBB proceeded with the scheduled foreclosure sale on November 3, 2020, submitted the high bid, and obtained a signed deed conveying the Property to JBB. (2020 Dckt. 92, pp. 123-24). Due to uncertainty over the applicability of the automatic stay, however, JBB did not record its deed. (2020 Dckt. 92, p. 124).

On November 5, 2020, JBB filed the instant Motion to Confirm No Stay is in Effect. (2020 Dckt. 7). In its motion, JBB argued that the automatic stay did not arise upon the filing of the 2020 case pursuant to § 362(n)(1)(B). As will be discussed in detail below, this provision of the Code states that the automatic stay does not apply in a case in which the debtor "was a debtor in a small business case that was dismissed for any reason by an order that became final in the 2-year period ending on the date of the order for relief entered with respect to the petition." 11 U.S.C. § 362(n)(1)(B). JBB contends that these requirements are satisfied because the Debtor had a previous small business case (i.e. the 2019 case) dismissed within the two years prior to the filing of the 2020 case.

On November 19, 2020, the Debtor filed a brief in opposition to JBB's Motion to Confirm No Stay is in Effect (2020 dckt. 35) and relied squarely on the exception to § 362(n)(1) set forth in § 362(n)(2)(B). Specifically, the Debtor argued that "(i) the filing of the petition result[ed] from circumstances beyond its control not foreseeable at the time the case then pending was filed; and (ii) it is more likely than not that the court will confirm a feasible, non-liquidating plan, within a reasonable period of time." (2020 Dckt. 35, p. 4). The facts upon which the Debtor relies to show that the filing of the instant case resulted from unforeseeable circumstances beyond its control are threefold, namely that the church's members did not authorize its 2011 incorporation, the loan transaction, or the 2019 bankruptcy filing. As the Debtor put it:

> The reality is that although the Debtor in the instant Bankruptcy has the same name as the debtor that filed the prior Bankruptcy in January 2019, which was dismissed in February 2020, it is really not the same debtor. Indeed, the prior Bankruptcy was not filed with the authorization of the Abundant Life members, and thus, was not filed by Abundant Life. The church is the members and no action is legitimate without the members' authorization.
>
> Indeed, it was not until after the prior Bankruptcy was dismissed that it was even discovered that Abundant Life was incorporated without the knowledge of the members. All of the information relative to how Abundant Life was incorporated, and how the organization had become indebted, and how the membership was completely unaware of all of this information did not completely come to light until after the previous Bankruptcy. Thus, these are all unforeseeable circumstances that were beyond

19

> Abundant Life's control at the time the prior case was
> filed.

(2020 Dckt. 35, p. 4). The Court scheduled a hearing on JBB's Motion to Confirm

No Stay is in Effect for November 30, 2020. (2020 Dckt. 32). In support of its

motion, JBB filed several pleadings from the 2020 state court litigation as exhibits.

(2020 Dckt. 57, 77). The Debtor likewise submitted filings from the state court

litigation. (2020 Dckt. 60).

On November 29, 2020, the eve of the scheduled hearing on JBB's Motion to

Confirm No Stay is in Effect, the Debtor amended its petition to make two changes.

(2020 Dckt. 58). First, the amended petition identified the Debtor by two names:

"Abundant Life Worship Center of Hinesville, GA, Inc./Abundant Life Worship

Center (Unincorporated)." (2020 Dckt. 58, p. 1). Second, the amended petition

indicated that the Debtor satisfied the requirements of 11 U.S.C. § 1182(1) and

elected to proceed under Subchapter V of Chapter 11. (2020 Dckt. 58, p. 2). On the

morning of November 30, 2020, prior to the hearing on JBB's Motion to Confirm

No Stay is in Effect, the Debtor filed a supplemental brief (2020 dckt. 59) arguing

the following:

> In addition to the reasons set forth in its initial Opposition
> Brief, filed on November 19, 2020, Abundant Life is
> entitled to the automatic stay protection offered under 11
> U.S.C. § 362 because it is not a debtor under the small
> business case exception contemplated under 11 U.S.C. §
> 362(n)(1)(B). On November 29, 2020, Abundant Life
> amended its Bankruptcy Petition and elected to proceed

under Subchapter V of Chapter 11. In doing so, it ceased being a debtor in a "small business case," as that term is applied relative to exceptions to the automatic stay. See Small Business Reorganization Act of 2019, Pub. L. No. 11654, 133 Stat. 1079, 1085 (amending 11 U.S.C. § 101(51C) to provide that a "small business case" is defined as one where the debtor "has not elected that [S]ubchapter V of chapter 11 of this title shall apply.") As such, there is no basis to except the automatic stay from applying to JBB.

(2020 Dckt. 59, p. 1). It is clear that the purpose of the Debtor's Subchapter V election was to bolster its defense to JBB's Motion to Confirm No Stay is in Effect.

At the November 30, 2020 hearing on JBB's Motion to Confirm No Stay is in Effect, counsel for JBB argued that under § 362(n)(1)(B), the automatic stay never arose in the 2020 case. (2020 Dckt. 92, pp. 8-16, 125-31, 138-41). Debtor's counsel argued that the Subchapter V election rendered § 362(n)(1)(B) inapplicable and, in the alternative, that the exception of § 362(n)(2)(B) applied. (2020 Dckt. 92, pp. 16-22, 132-38).[21] Counsel for the U.S. Trustee argued that the Debtor's Subchapter V election had no effect on the applicability of § 362(n)(1)(B). (2020 Dckt. 92, pp. 24-26). The Court then heard testimony from Bishop Norwood in support of the Debtor's evidentiary burden under § 362(n)(2)(B) (2020 dckt. 92, pp. 48-115) and rebuttal testimony from JBB's managing member, Roger King. (2020 Dckt. 92, pp. 118-24). The parties agreed that the Court could consider the filings in the state court

---

[21] As noted, a transcript of that hearing appears at 2020 Dckt. 92.

litigation and in both bankruptcy cases. (2020 Dckt. 92, pp. 29-32, 39-41, 46-47). Although the Debtor presented no documentary evidence at the hearing, the Court left open the record for the filing of supplemental evidence. (2020 Dckt. 92, pp. 116-17). At the conclusion of the hearing, the Court took the matter under advisement and set deadlines of December 5, 2020, for supplemental evidence and of December 9, 2020, for briefs. (2020 Dckt. 92, pp. 116-17, 145-46, 153-54).

Regarding the Debtor's amended petition, the Court stated at the hearing that interested parties would be given an opportunity to object to the Debtor's Subchapter V election (2020 dckt. 92, pp. 6-7, 149, 152), and that hearing was scheduled for December 10, 2020. (2020 Dckt. 63). The Court also stated that a show cause hearing would be scheduled as to the Debtor's use of two names in the amended petition, which seemingly indicated improper joint debtors. (2020 Dckt. 92, pp. 143-45, 149-50; 2020 Dckt. 62). That show cause hearing was canceled after the Debtor again amended its petition on December 2, 2020, and reverted to its original name. (2020 Dckt. 78, 90). The Debtor continued its election to proceed under Subchapter V. (2020 Dckt. 78).

On December 8, 2020, JBB objected to the Debtor's election to proceed under Subchapter V. (2020 Dckt. 94). According to JBB, the Court should not permit the election because it was made in bad faith and would unduly prejudice JBB. (2020 Dckt. 94, pp. 7-10). At the December 10, 2020 hearing, the court heard argument

from counsel as to the propriety of the Debtor's Subchapter V election. The Subchapter V Trustee observed that in his view, the election should not result in the retroactive application of the automatic stay.[22] At the conclusion of the hearing, the Court took under advisement JBB's objection to the Subchapter V election. As set forth in a separate order, the Court finds that the election was not made in bad faith and did not unduly prejudice JBB, and thus the Debtor will be allowed to proceed under Subchapter V. Nevertheless, the Court will grant JBB's Motion to Confirm No Stay is in Effect for the reasons set forth below.


## IV. CONCLUSIONS OF LAW

### A. Section 362(n)(1) Applies to the 2020 Case

Among the many changes to the Bankruptcy Code enacted by Congress under the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") was the addition of § 362(n). Ordinarily, the filing of a bankruptcy petition operates as an automatic stay of certain collection activities against a debtor or against property of the bankruptcy estate. 11 U.S.C. § 362(a). Section 362(n)(1), however, enumerates some circumstances in which the stay does not arise:

> (n)(1) Except as provided in paragraph (2), subsection (a) does not apply in a case in which the debtor—

---

[22] On November 30, 2020, the U.S. Trustee appointed James C. Overstreet, Jr., as Subchapter V Trustee pursuant to § 1183(a). (2020 Dckt. 61).

(A) is a debtor in a small business case pending at the time the petition is filed;

(B) was a debtor in a small business case that was dismissed for any reason by an order that became final in the 2-year period ending on the date of the order for relief entered with respect to the petition;

(C) was a debtor in a small business case in which a plan was confirmed in the 2-year period ending on the date of the order for relief entered with respect to the petition; or

(D) is an entity that has acquired substantially all of the assets or business of a small business debtor described in subparagraph (A), (B), or (C), unless such entity establishes by a preponderance of the evidence that such entity acquired substantially all of the assets or business of such small business debtor in good faith and not for the purpose of evading this paragraph.

11 U.S.C. § 362(n)(1). At issue in this case is § 362(n)(1)(B), which states that no stay comes into effect if the debtor "was a debtor in a small business case that was dismissed for any reason by an order that became final in the 2-year period ending on the date of the order for relief entered with respect to the petition[.]" 11 U.S.C. § 362(n)(1)(B). In its Motion to Confirm No Stay is in Effect, JBB contends that the automatic stay did not arise in the instant case by virtue of the dismissal of the 2019 case. The Court agrees.

Under § 362(n)(1)(B), the automatic stay does not come into effect if three elements are satisfied: (1) the debtor was a debtor in small business case; (2) that

case was dismissed; and (3) the order dismissing that case became final in the two-year period ending on the date of the order for relief. Here, the first element is satisfied, as there is no dispute that the Debtor's 2019 case was a small business case.[23] Counsel for the U.S. Trustee conducted a § 341 meeting on February 6, 2019, and subsequently filed his meeting notes reciting that "[t]his case involves a small business debtor." (2019 Dckt. 38, 39). On February 26, 2019, the Debtor filed its first Monthly Operating Report for Small Business Under Chapter 11 using Official Form 425C. (2019 Dckt. 52).[24] In its amended petition filed on February 27, 2019, the Debtor indicated that it was a small business debtor under 11 U.S.C. § 101(51D); by definition the case was a small business case under § 101(51C) as that Code section then read.[25] (2019 Dckt. 56, p. 2). Pursuant to Rule 1020(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), "the status of the case as a small business case shall be in accordance with the debtor's statement under this subdivision, unless and until the court enters an order finding that the debtor's statement is incorrect." Fed. R. Bankr. P. 1020(a). No party in interest objected to

---

[23] A church or other non-profit entity can be a small business debtor. *See In re Ellingsworth Residential Cmty. Ass'n*, 619 B.R. 519, 521-522 (Bankr. M.D. Fla. 2020). *See also In re Charles Street African Methodist Episcopal Church of Boston*, 478 B.R. 73 (Bankr. D. Mass. 2012).

[24] Subsequent small business monthly operating reports appear at 2019 Dckt. 81, 104, 105, 123, 158, 159, 185, 201, 226, 238, and 239.

[25] As will be discussed below, the definition of "small business case" was amended by the Small Business Reorganization Act of 2019.

the Debtor's statement under Bankruptcy Rule 1020(b), and the Court never entered an order finding the Debtor's statement incorrect. Therefore, the 2019 case was a small business case, satisfying the first element under § 362(n)(1)(B).[26]

The second and third elements of § 362(n)(1)(B) are also satisfied. The 2019 case was dismissed based on the Debtor's failure to file its disclosure statement or plan. (2019 Dckt. 284). The order dismissing the case was entered on March 2, 2020, which was within the two-year period preceding the filing of the instant case on November 2, 2020.[27] (2020 Dckt. 1). Accordingly, all three elements are satisfied, and therefore by operation of § 362(n)(1)(B), the automatic stay never came into effect in the 2020 case unless the exception of § 362(n)(2)(B) applies, as the Debtor urged in its initial brief in opposition.

B. The Exception of Section 362(n)(2)(B) Does Not Apply

Section 362(n)(2)(B) provides an exception to § 362(n)(1)(B) whereby a debtor has the burden of establishing that the automatic stay *did* come into effect upon the filing of the petition in the latter case. Specifically, that exception provides:

> (2) Paragraph (1) does not apply—

---

[26] At the November 30, 2020 hearing, Debtor's counsel acknowledged that the 2019 case was a small business case. (2020 Dckt. 92, pp. 27-28).

[27] The term "order for relief" in § 362(n)(1)(B) refers in a voluntary case to the petition commencing said case. As set forth in § 301, "[a] voluntary case under a chapter of this title is commenced by the filing with the bankruptcy court of a petition under such chapter by an entity that may be a debtor under such chapter," and "[t]he commencement of a voluntary case under a chapter of this title constitutes an order for relief under such chapter." 11 U.S.C. § 301.

. . .

(B) to the filing of a petition if—

>>> (i) the debtor proves by a preponderance of the evidence that the filing of the petition resulted from circumstances beyond the control of the debtor not foreseeable at the time the case then pending was filed; and

>>> (ii) it is more likely than not that the court will confirm a feasible plan, but not a liquidating plan, within a reasonable period of time.

11 U.S.C. § 362(n)(2)(B). The Debtor contends that the filing of the petition in the 2020 case resulted from unforeseeable circumstances beyond its control and that it is more likely than not that a feasible non-liquidating plan will be confirmed within a reasonable time. Accordingly, the Debtor avers, the automatic stay *did* arise in the 2020 case.

Relying on the case of *Palmer v. Bank of the West*, 438 B.R. 167 (E.D. Wis. 2010), however, JBB contends that the § 362(n)(2)(B) exception applies only when there are two cases pending at the same time. In *Palmer*, the debtor filed her first small business case on April 9, 2009. The case was dismissed on April 1, 2010. And on April 9, 2010, the debtor filed her second small business case. *Id.* at 168. Before the bankruptcy court, the debtor moved to extend the automatic stay. The bankruptcy court denied that motion because, under § 362(n)(1)(B), the automatic stay did not

arise in the second case.[28] *Id.* On appeal, the district court affirmed the bankruptcy court's decision. As the district court stated, "the plain language" of § 362(n)(2)(B)(i) did not support the debtor's interpretation, which was identical to the Debtor's interpretation in this case. *Id.* at 169. Instead, the district court found that the phrase "the case then pending" in § 362(n)(2)(B)(i) refers to "a separate case that *is* pending at the time the second petition is filed," as contemplated by § 362(n)(1)(A). *Id.* (emphasis in original). Although the district court acknowledged that "Congress could have been more precise in its drafting," it found that "the foregoing construction conforms with the plain language of the statute."[29] *Id.*

The Court agrees with *Palmer* and finds that the meaning of the statute is plain and unambiguous. Any interpretation of the Bankruptcy Code must begin with the language of the statute itself. *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1759 (2018). "If the 'language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case,' and 'the statutory scheme is coherent and consistent,' the inquiry is over." *In re BFW Liquidation, LLC*, 899 F.3d 1178, 1188 (11th Cir. 2018) (quoting *Bankston v. Then*, 615 F.3d 1364, 1367 (11th

---

[28] *See In re Julie Marie Palmer*, case no. 10-25464-mdm (Bankr. E.D. Wis.), dckt. 7; dckt. 16; dckt. 22; and dckt. 70, pp. 52-53.

[29] For further analysis of *Palmer*, see David I. Cisar and Shay A. Agsten, *No Second Chances: Serial Filing Effectively Prohibited in Small Business Chapter 11s*, American Bankruptcy Institute Journal, February 2011, at 73-74 (concluding that "[t]he practical effect of § 362(n) is to prevent voluntary serial small business debtor filings[.]").

Cir. 2010)). "In determining whether a statute is plain or ambiguous, [courts] consider 'the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Id.* (quoting *Bankston*, 615 F.3d at 1367). "Statutory language is ambiguous if it is susceptible to more than one reasonable interpretation." *Id.* (citing *Med. Transp. Mgmt. Corp. v. Comm'r of I.R.S.*, 506 F.3d 1364, 1368 (11th Cir. 2007)).

Here, § 362(n)(2)(B) provides that § 362(n)(1) does not apply "to the filing of a petition if . . . the debtor proves by a preponderance of the evidence that the filing of the petition resulted from circumstances beyond the control of the debtor not foreseeable at the time *the case then pending* was filed[.]" 11 U.S.C. § 362(n)(2)(B)(i) (emphasis added). The phrase "the case then pending" refers not, as the Debtor contends, to a previous small business case dismissed in the prior two years as set forth in § 362(n)(1)(B). Plainly, a previous case that has been dismissed is not a "case then pending." Rather, the phrase at issue must refer to "a small business case pending at the time the petition is filed" as stated in § 362(n)(1)(A). In other words, it means a separate case pending at the same time, as the court held in *Palmer*.

Against this interpretation, the Debtor cites the case of *In re MCC Humble Auto Paint, Inc.*, No. 12-33907-H3-11, 2012 WL 5471984 (Bankr. S.D. Tex. Nov. 9, 2012). There, the debtor had a small business case dismissed on May 3, 2012. The

29

debtor then filed a second case on May 29, 2012. The bankruptcy court found that § 362(n)(1)(B) applied and that the Debtor failed to satisfy its burden of proof under § 362(n)(2)(B). *Id.* at *2. According to the Debtor, the court in *MCC Humble* must have interpreted the phrase "the case then pending" in § 362(n)(2)(B) as referring to the debtor's prior case, contrary to *Palmer*. (2020 Dckt. 35, p. 5). But there is nothing in *MCC Humble* that is necessarily inconsistent with *Palmer*. The court in *MCC Humble* simply assumed that § 362(n)(2)(B) applied and ruled, *a fortiori*, that the Debtor failed to satisfy its burden. Thus, it was unnecessary for the court in *MCC Humble* to decide whether § 362(n)(2)(B) actually applied. But even if *MCC Humble* does constitute contrary authority, it lacks the detailed statutory analysis of *Palmer* and therefore is not persuasive authority.

The Debtor also argues that the statutory interpretation in *Palmer* "perhaps defeats the purpose of the [§ 362(n)(2)(B)] exception inasmuch as there would rarely be a need to file a voluntary Bankruptcy proceeding, if ever, while a voluntary Bankruptcy proceeding is pending." (2020 Dckt. 35, pp. 4-5). In other words, if § 362(n)(2)(B) only applies to two cases pending at the same time, "then perhaps there would be no occasions where the exception contemplated by § 362(n)(2)(B) would be triggered, thereby rendering that portion of the statute meaningless." (2020 Dckt. 35, p. 5).

30

But the statutory context of § 362(n)(2)(B) demonstrates that the exception is not meaningless. Section 362(n)(1) limits the automatic stay in serial filings by small business debtors. It does so in four different ways, each reflecting different means by which serial filings can be accomplished. First, under § 362(n)(1)(A), the automatic stay does not come into effect if the debtor is already in a pending small business case. Second, § 362(n)(1)(B) provides that no stay comes into effect if the debtor had a prior small business case dismissed within the previous two years. Third, § 362(n)(1)(C) provides that no stay comes into effect if the debtor had a confirmed plan in a small business case within the previous two years. And fourth, under § 362(n)(1)(D), an entity that acquires all or substantially all the assets or business of a small business debtor under § 362(n)(1)(A), (B), or (C) likewise does not receive the benefit of the automatic stay unless it can show by a preponderance of the evidence that it did so "in good faith and not for the purpose of evading this paragraph." 11 U.S.C. § 362(n)(1)(D).

This statutory scheme makes it clear that Congress sought to eliminate the protection of the stay in all these scenarios. And the exception of § 362(n)(2)(B) applies specifically to the scenario described in § 362(n)(1)(A) where a debtor has two cases pending at the same time. This exception allows the debtor to put on evidence showing that, notwithstanding the pendency of the first case, the stay should nevertheless arise in the second case. There is nothing meaningless about

31

such a provision. Accordingly, the Court adopts the reasoning of *Palmer* and finds that § 362(n)(2)(B) does not apply because the Debtor did not have two cases pending at the same time. The automatic stay, therefore, never came into effect.[30]

C. The Debtor Has Not Shown Unforeseeable Circumstances Beyond its Control

Even if the Debtor is correct in asserting that § 362(n)(2)(B) applies, the automatic stay only arose at the time of filing if the Debtor "proves by a preponderance of the evidence that the filing of the petition [in the 2020 case] resulted from circumstances beyond the control of the debtor not foreseeable at the time the case then pending [i.e. the 2019 case per the Debtor's interpretation] was filed; and . . . it is more likely than not that the court will confirm a feasible plan, but not a liquidating plan, within a reasonable period of time." 11 U.S.C. § 362(n)(2)(B). The Debtor has failed to satisfy this burden.

First, the instant case did not result from circumstances beyond the Debtor's control that were unforeseeable at the time the 2019 case was filed. The Debtor's sole argument as to this required element is that its church members did not approve

---

[30] Because the meaning of the statute is plain, the Court need not consider any legislative history to determine congressional intent. Some commentators have pointed out that § 362(n) had its origins in a 1997 report prepared by the National Bankruptcy Review Commission. *See* Thomas E. Carlson and Jennifer Frasier Hayes, *The Small Business Provisions of the 2005 Bankruptcy Amendments*, 79 Am. Bankr. L.J. 645 (2005). *See also* Nat'l Bankr. Rev. Comm'n, *Bankruptcy: The Next Twenty Years*, 610-12 (1997) (available online at https://govinfo.library.unt.edu/nbrc/reportcont.html). The Court observes that the statutory text of § 362(n)(2)(B)(i) is different from the corresponding language in the report. In any event, the Court will not allow a report published in 1997 to contradict the plain meaning of a statute passed by Congress and signed by the President in 2005.

certain actions taken by the Debtor corporation. According to the Debtor, it is a congregational church, and thus "no action is legitimate without the members' authorization." (2020 Dckt. 35, p. 4). Georgia law indeed distinguishes between congregational churches, which "owe[] no fealty or obligation to any higher authority" and in which "a majority of [the] members control [the] decisions and local church property," and hierarchical churches that are "organized as a body with other churches having similar faith and doctrine with a common ruling convocation or ecclesiastical head." *Crumbley v. Solomon*, 243 Ga. 343, 344 (1979). Citing this authority, the Debtor alleges that its members never approved its incorporation in 2011, the loan transaction, or the filing of the 2019 bankruptcy. These facts, which supposedly were not discovered until after the 2019 bankruptcy was dismissed, are claimed by the Debtor to constitute unforeseeable circumstances beyond its control. (2020 Dckt. 35, p. 4). But this argument has no merit.

As to the Debtor's reincorporation in 2011, Bishop Norwood testified that the church's members did not know about or approve of that action. (2020 Dckt. 92, pp. 51, 62-64). But the church members' approval has no bearing on the existence of the corporation. The Debtor is subject to the Georgia Nonprofit Corporation Code, which is "fully applicable to all nonprofit corporations organized for religious . . . purposes, including incorporated churches[.]" O.C.G.A. § 14-5-40. "The broad application of the nonprofit corporation codes to religious corporations demonstrates

33

the General Assembly's clear intent to apply corporate law to all religious corporations in the state." *Rectors, Wardens and Vestrymen of Christ Church in Savannah v. Bishop of the Episcopal Diocese of Georgia, Inc.*, 305 Ga. App. 87, 91 (2010). And under the Georgia Nonprofit Corporation Code, "[t]he Secretary of State's filing of the articles of incorporation is conclusive proof that the incorporators satisfied all conditions precedent to incorporation except in a proceeding by the state to cancel or revoke the incorporation or administratively dissolve the corporation." O.C.G.A. § 14-3-203(b). Thus, the Debtor's corporate form came into existence regardless of whether Bishop Norwood received approval from the congregation, and the alleged discovery of the 2011 incorporation does not constitute an unforeseeable circumstance beyond the Debtor's control.

Likewise, the Debtor argues that the loan transaction was undertaken without the approval of the membership. In its filings in this bankruptcy case, the Debtor states that "all of the information relative to . . . how the organization had become indebted . . . did not completely come to light until after the previous bankruptcy," (2020 dckt. 35, p. 4), and Bishop Norwood testified to the same. (2020 Dckt. 92, pp. 64-65). The Debtor presented this same argument to Judge Russell in the state court case, reciting in its brief that "ALWC's members have never voted on or approved any of the underlying loans, mortgages, forbearance agreements, or any sort of encumbrance of the [Property] whatsoever." (2020 Dckt. 57-1, p. 8). Based on this

34

allegation, the Debtor argued that "[t]o the extent that certain individuals were convinced to take certain actions in furtherance of such encumbrances, they were not authorized by ALWC's membership and are therefore, as a matter of law, null and void." [31] (2020 Dckt. 57-1, p. 8).

In support of this argument before Judge Russell, the Debtor cited numerous cases, both from the Supreme Court of the United States and from the courts of the State of Georgia, standing for the proposition that in a congregational church, decisions must be made by the members.[32] *See, e.g., Little v. First Baptist Church, Crestwood*, 475 U.S. 1148 (1986); *Jones v. Wolf*, 443 U.S. 595 (1979); *Watson v. Jones*, 80 U.S. 679 (1871); *Reddick v. Jones*, 251 Ga. 195 (1983); *Bagley v. Carter*, 235 Ga. 624 (1975); *Everett v. Jennings*, 137 Ga. 253 (1911); *Howard v. Johnson*, 264 Ga. App. 660 (2003); *Kim v. Lim*, 254 Ga. App. 627 (2002); *Kidist Marian Ethiopian Orthodox Tawahedo Church, Inc. v. Kidist Mariam Ethiopian Orthodox Tawahedo Church, Inc.*, 219 Ga. App. 470 (1995). But these cases involve internal disputes between different factions within the same church. For example, in *Reddick v. Jones*, a congregational church's board of directors voted to fire the pastor. 251

---

[31] It is not clear exactly what actions the Debtor sought to nullify as unauthorized. The exhibits filed in the 2019 adversary proceeding reflect that the loan from United Community Bank was modified multiple times before it was sold. *See* 2019 Adv. Dckt. 1, 23. Notably, the Debtor did not name United Community Bank as a defendant in either the 2019 adversary proceeding or the 2020 state court litigation.

[32] *See* 2020 Dckt. 57-1, 2020 Dckt. 60.

Ga. at 195. The pastor and certain members loyal to him filed suit against ten dissidents. *Id.* The trial court found that the board lacked authority to fire the pastor. *Id.* at 196. On appeal, the Supreme Court of Georgia explained that in disputes over property rights, "Georgia has adopted a presumptive rule of majority representation which can be overcome by the application of neutral principles of law such as state statutes, corporate charters, relevant deeds, and the organizational constitutions of denominations." *Id.* (citing *Jones v. Wolf*, 244 Ga. 388 (1979)). Based on the corporate bylaws, the Supreme Court of Georgia held that the right to terminate the pastor's employment resided solely with the general membership. *Id.* Here, the Debtor has not submitted any corporate or church bylaws for the Court to review. At the November 30, 2020 hearing, Bishop Norwood testified that the Debtor's bylaws require all decisions to be made by the congregation, although his testimony was somewhat confusing on this point.[33] (2020 Dckt. 92, pp. 56-58). Regardless, a case such as *Reddick* involving a church schism has no bearing on a transaction between the Debtor and a third party such as JBB.

The Georgia Nonprofit Corporation Code is clear that "the validity of corporate action may not be challenged on the ground that the corporation lacks or lacked power to act" except in three circumstances:

---

[33] The U.S. Trustee represents that "[i]n advance of the initial debtor interview in this case, Abundant Life advised the U.S. Trustee that it had no bylaws." (2020 Dckt. 97, p. 7).

> (1) In a proceeding by a member against the corporation to enjoin the act;
>
> (2) In a proceeding by the corporation, directly, derivatively, or through a receiver, trustee, or other legal representative, against an incumbent or former director, officer, employee, or agent of the corporation; or
>
> (3) In a proceeding by the Attorney General under Code Section 14-3-1430.

O.C.G.A. § 14-3-304(b). Applying the predecessor to this statute, the Court of Appeals of Georgia held that the *ultra vires* doctrine was abolished "as a means of avoiding a transaction which a corporation later claims is beyond its capacity or power" except in the "three enumerated instances[.]" *Free for All Missionary Baptist Church, Inc. v. SE Beverage & Ice Equip. Co., Inc.*, 135 Ga. App. 498, 499 (1975). The Court of Appeals likewise stated that a "corporation is not relieved of liability to any third person for acts of its officers by reason of any limitation upon the power of the officers not known to such third person." *Id.* (citing *Riverdale Assembly of God, Inc. v. Advanced Refrigeration, Inc.*, 128 Ga. App. 718 (1973)). It is this authority, not the cases cited by the Debtor, that is controlling. As none of the three enumerated exceptions apply here, the loan transaction was not void as an *ultra vires* act. Therefore, the alleged discovery that the church membership did not authorize the loan transaction likewise does not constitute an unforeseeable circumstance beyond the Debtor's control.

37

Finally, the Debtor contends that another of the unforeseeable circumstances contemplated by § 362(n)(2)(B) is that the 2019 bankruptcy was not authorized by the church members. Bishop Norwood testified to that effect at the November 30, 2020 hearing. (2020 Dckt. 92, pp. 59, 75-76). Based on this allegation, the Debtor claims that "although the Debtor in the instant Bankruptcy has the same name as the debtor that filed the prior Bankruptcy in January 2019 . . . it is really not the same debtor" because "the prior Bankruptcy was not filed with the authorization of the Abundant Life members, and thus, was not filed by Abundant Life." (2020 Dckt. 35, p. 4).

This is wrong. The Debtor in the 2019 case is the same Debtor in the 2020 case. Both entities have the same corporate name, Abundant Life Worship Center of Hinesville, GA, Inc. (2019 Dckt. 56, p. 1; 2020 Dckt. 78, p. 1). Both have the same federal tax identification number.[34] (2019 Dckt. 56, p. 1; 2020 Dckt. 78, p. 1). Both have the same physical address and the same mailing address. (2019 Dckt. 56, p. 1; 2020 Dckt. 78, p. 1). The petition in the 2020 case declares, plainly, that the Debtor filed a prior case in 2019, referring to case no. 19-40004-EJC. (2020 Dckt. 78, p. 3). And both the 2019 petition and the 2020 petition have attached a board resolution authorizing the Debtor, with Bishop Norwood as its authorized officer, to file

---

[34] At the November 30, 2020 hearing, Debtor's counsel acknowledged that the Debtor in both cases had the same name and tax ID number. (2020 Dckt. 92, pp. 22-23, 27).

Chapter 11. (2019 Dckt. 1, pp. 5-7; 2020 Dckt. 1, pp. 6-9). Aside from different dates and attorneys listed, these resolutions are virtually identical.

The Georgia Nonprofit Corporation Code requires each subject corporation to have a board of directors. O.C.G.A. § 14-3-801(a). "[A]ll corporate powers shall be exercised by or under the authority of, and the business and affairs of the corporation managed under the direction of, its board." O.C.G.A. § 14-3-801(b). "No limitation upon the authority of the directors, whether contained in the articles of incorporation or bylaws, shall be effective against persons, other than members and directors, who are without actual knowledge of the limitation." O.C.G.A. § 14-3-801(c). Consistent with these provisions, the board resolution attached to the 2019 petition authorized the filing of that bankruptcy case, and the Debtor cannot now claim otherwise.

Indeed, the Court agrees with the U.S. Trustee that the Debtor is now judicially estopped from arguing that its prior bankruptcy case was unauthorized. (2020 Dckt. 97, pp. 4-7). "The equitable doctrine of judicial estoppel is intended to 'prevent the perversion of the judicial process' and 'protect [its] integrity . . . by prohibiting parties from deliberately changing positions according to the exigencies of the moment.'" *Slater v. U.S. Steel Corp.*, 871 F.3d 1174, 1180 (11th Cir. 2017) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001)). "[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume

39

a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *New Hampshire*, 532 U.S. at 749 (quoting *Davis v. Wakelee*, 156 U.S. 680, 689 (1895)).

The Supreme Court of the United States has explained that the doctrine of judicial estoppel applies where three conditions are met. "First, a party's later position must be 'clearly inconsistent' with its earlier position." *Id.* at 750. Second, the party must have "succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or the second court was misled[.]'" *Id.* Third, "the party seeking to assert an inconsistent position [must] derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* at 751. All three elements are easily satisfied here. In the 2019 case, the Debtor represented to the Court and to other interested parties that its petition was authorized. Consequently, the Debtor enjoyed the benefits provided by the Bankruptcy Code, including the protection of the automatic stay. To allow the Debtor to thwart the operation of § 362(n)(1)(B) by arguing that its 2019 petition was not authorized would impose an unfair detriment to creditors, particularly JBB. The doctrine therefore bars the Debtor from asserting that its 2019 case was unauthorized, and therefore this too was not an unforeseeable circumstance beyond

the Debtor's control. For these reasons, the Court finds that the Debtor has not carried its burden under § 362(n)(2)(B)(i).

D. The Debtor Has Not Shown that Plan Confirmation is Likely

Similarly, the Debtor has failed to show that the Court will more likely than not confirm a plan of reorganization within a reasonable time, as required by § 362(n)(2)(B)(ii). This is evidenced by the fact that the Debtor's 2019 case was pending for over a year, from January 2, 2019, to March 2, 2020. During that time, the Debtor entered into and backed out of two settlements with JBB, litigated the value of the Property, and filed an adversary proceeding.[35] Clearly, the Debtor was given an opportunity to reorganize. But what it did *not* do in the 2019 case was file a plan of reorganization. And now its financial condition is worse than in the 2019 case.

At the November 30, 2020 hearing, the Debtor submitted no documentary evidence as to its financial condition. Its only evidence was the testimony of Bishop Norwood. According to his testimony, he believes that church membership, which currently numbers some 25 to 30 people, will increase "with the pandemic lifting."

---

[35] The Debtor's reorganization in the 2019 case may have been bogged down by that adversary proceeding, which never proceeded beyond the filing of motions to dismiss. But Debtor's counsel in the 2020 case has promised to file soon another adversary proceeding that "will not only mirror the one filed on November 6, 2019, it will expound on those claims." (2020 Dckt. 98, p. 1). In this forthcoming adversary proceeding, the Debtor will request "an equitable subordination, and pursue tort and breach of contract claims, among others[.]" (2020 Dckt. 98, p. 3).

(2020 Dckt. 92, pp. 51, 66-68). He also testified that the church would begin a new capital campaign, although he was unable to estimate how much would be raised. (2020 Dckt. 92, pp. 68, 102-105).

After the hearing, the Court left open the record to allow the parties to submit additional evidence (2020 dckt. 92, pp. 116-17), and the Debtor filed a declaration by Bishop Norwood and an accompanying brief offering additional detail on this capital campaign. (2020 Dckt. 98). Specifically, Bishop Norwood stated that "[t]he capital campaign will consist of pledging, weekly fundraising initiatives, fundraising competitions, membership drives, and a Marquee Conference event designed to increase revenues by at least thirty thousand dollars ($30,000) above standard monthly revenue projections, and increase membership by 100% by quarter end." (2020 Dckt. 98, p. 11).

Apart from Bishop Norwood's wishful thinking, however, the evidence paints a negative picture of the Debtor's financial condition. As reflected in its statement of financial affairs, the Debtor's only source of income consists of tithes and offerings. (2020 Dckt. 74, p. 1). And that income declined from $260,549.00 in 2018 to $216,763.97 in 2019 and further declined to $99,484.06 for the period between January 1, 2020, and the November 2, 2020 filing date.[36] (2020 Dckt. 74, p. 1). At

---

[36] At the November 30, 2020 hearing, Debtor's counsel stated that her client would not dispute any numbers in schedules submitted in the 2019 or 2020 cases. (2020 Dckt. 92, p. 85).

the hearing, Bishop Norwood acknowledged that the Debtor has been impacted financially by the coronavirus pandemic, stating that its income had declined since 2019 to about $16,000.00 per month in 2020. (2020 Dckt. 92, pp. 66, 71-72 94, 111). Meanwhile, the Debtor's unsecured debt rose from $33,623.40 in the 2019 case (2019 dckt. 61, p. 3) to $277,708.52[37] in the 2020 case.[38] (2020 Dckt. 70, p. 6). In short, income is down and debt is up.

The Court is not convinced that the Debtor will more likely than not have a plan confirmed within a reasonable time.[39] The Debtor was unable to file a plan after more than a year of Chapter 11 proceedings in the 2019 case and thus far has not presented one in this case. Based on the evidence presented, the Court finds that even if § 362(n)(2)(B) does apply, the Debtor has not carried its burden under § 362(n)(2)(B)(ii) of showing that plan confirmation is more likely than not to take place within a reasonable time.

---

[37] The bulk of this unsecured debt consists of attorneys' fees incurred in the 2019 case, as reflected by the scheduled $148,009.49 debt to Mr. Boone's firm James-Bates-Brannan-Groover-LLP and the $64,643.03 debt to Mr. Hall. (2020 Dckt. 70, pp. 2-3; 2020 Claim No. 1). The law firm that filed the state court action, Reed Thomas Law Group, has not yet filed a claim in this case.

[38] The amount of secured debt was $1,936,282.48 in both the 2019 and 2020 cases. (2019 Dckt. 59, p.1; 2020 Dckt. 73, p. 1).

[39] This finding for purposes of § 362(n)(2)(B) is based on the Debtor's need to pay the secured claim of JBB. In light of the Court's ruling, however, once the Debtor is unburdened from this $2.7 million debt, it may well be able to reorganize by, for example, leasing another facility at a manageable rental rate.

E. <u>The Debtor's Subchapter V Election Does Not Change the Result</u>

Apparently realizing the weakness of its position under § 362(n), on November 29, 2020, the Debtor adopted an alternative strategy: it amended its petition to proceed under Subchapter V of Chapter 11. (2020 Dckt. 58). In its supplemental brief filed the following day, the Debtor made explicit the purpose of this amendment, arguing that by electing Subchapter V, "it ceased being a debtor in a 'small business case,' as that term is applied relative to exceptions to the automatic stay." (2020 Dckt. 59, p. 1). In other words, the Debtor contends that because it is now a Subchapter V debtor, § 362(n)(1)(B) does not apply. The Debtor's argument is unavailing.

Prior to the February 19, 2020 effective date of the Small Business Reorganization Act of 2019, Pub. L. No. 116-54 (the "SBRA"), the Code defined the term "small business case" as "a case filed under chapter 11 of this title in which the debtor is a small business debtor."[40] 11 U.S.C. § 101(51C). The term "small business debtor," in turn, is defined in § 101(51D). As amended by the SBRA, however, § 101(51C) now reads as follows:

---

[40] The SBRA added § 1182, which originally defined the term "debtor" for purposes of Subchapter V simply as a "small business debtor" as defined in § 101(51D). The definition of "debtor" in § 1182(1) was subsequently amended by Coronavirus Aid, Relief, and Economic Security Act of 2020, Pub. L. No. 116-136 (the "CARES Act"), to raise the Subchapter V debt limit to $7,500,000.00 for a period of one year after March 27, 2020. *See* Hon. Paul W. Bonapfel, *A Guide to the Small Business Reorganization Act of 2019*, 9-10 (2020).

> The term "small business case" means a case filed under chapter 11 of this title in which the debtor is a small business debtor *and has not elected that subchapter V of chapter 11 of this title shall apply.*

11 U.S.C. § 101(51C) (emphasis added). This amendment matters because § 362(n)(1) provides that the automatic stay does not arise "in a case in which the debtor … was a debtor in a *small business case* that was dismissed for any reason by an order that became final in the 2-year period ending on the date of the order for relief entered with respect to the petition." 11 U.S.C. § 362(n)(1)(B). According to the Debtor, it is no longer a small business case under the amended § 101(51C) by virtue of its Subchapter V election, and thus § 362(n)(1)(B) does not apply.

But the Debtor misreads § 362(n)(1)(B). Under the plain meaning of the text, the stay does not apply in a "case" if the debtor had a "small business case" dismissed within the prior two years. The statute plainly requires only that the prior case was a small business case, not the subsequent case. The cases applying § 362(n)(1)(B) focus on whether the first bankruptcy case, not the second one, was a small business case. *See In re Artisanal 2015, LLC*, No. 17-12319 (JLB), 2017 WL 5125545, at *13 (Bankr. S.D.N.Y. Nov. 3, 2017); *Palmer*, 438 B.R. at 169. Here, as noted, the Debtor's 2019 case was a small business case, so the status of the 2020 case makes no difference. Therefore, the Debtor's election to proceed under Subchapter V does not rescue it from the operation of § 362(n)(1)(B).

Finally, even if the Debtor's Subchapter V election did render § 362(n)(1)(B) inapplicable, the Court would not make that election retroactive to the petition date. Interim Bankruptcy Rule 1020(a), made applicable in this Court by General Order Number 2020-2, requires a debtor to "state in the petition whether it is a small business debtor or a debtor as defined in § 1182(1) of the Code and, if the latter, whether the debtor elects to have subchapter V of chapter 11 apply." Fed. R. Bankr. P. Interim 1020(a). Here, the Debtor did not elect Subchapter V in its initial petition on November 2, 2020. Instead, the Debtor waited until November 29, 2020, to elect to proceed under Subchapter V. The Court agrees with JBB that this election cannot have retroactive effect. See, e.g., *In re Moore Prop. of Person Cnty., LLC*, No. 20-80081, 2020 WL 995544 (Bankr. M.D.N.C. Feb. 28, 2020) (citing *In re Castle Horizon Real Est.*, No. 09-05992-8-JRL, 2010 WL 3636160, at * 1 (Bankr. E.D.N.C. Sept. 10, 2010) ("nothing in [Rule 1020(a)] suggests that a change to the [small business] designation either by the debtor or by the court is retroactive"); *In re Harris*, 424 B.R. 44, 54 n.7 (Bankr. E.D.N.Y. 2010) (noting that while Bankruptcy Rule 1009(a) provides that a petition may be amended, it "does not provide that amendments to a bankruptcy petition apply retroactively").

Moreover, the Eleventh Circuit has previously ruled that bankruptcy courts lack authority to retroactively impose the automatic stay. *Lashley v. First National Bank of Live Oak (In re Lashley)*, 825 F.2d 362, 364 (11th Cir. 1987) ("While the

Bankruptcy Code grants the bankruptcy court the power to retroactively *grant relief* from a stay . . . this court is unaware of any authority that grants the bankruptcy court the power to retroactively *impose* a stay.") (emphasis in original). The Debtor has not cited, and the Court has not found, any contrary Eleventh Circuit authority.[41] Thus, the automatic stay never arose in the 2020 case.

## V. CONCLUSION

For the reasons set forth above, the Court will **GRANT** JBB's Motion to Confirm No Stay is in Effect (2020 Dckt. 7) and its supplemental motion. (2020 Dckt. 96). A separate Order will be entered consistent with this Opinion.

Dated at Savannah, Georgia, this 16th day of December, 2020.

Edward J. Coleman, III, Chief Judge
United States Bankruptcy Court
Southern District of Georgia

---

[41] It appears that *Lashley* remains binding precedent. *See In re Cook*, 614 B.R. 635, 642 (Bankr. N.D. Ga. 2020) ("The Court . . . is not convinced that it can impose the stay retroactively to the Petition Date."); *Holloway v. Valley Auto Sales (In re Holloway)*, 565 B.R. 435, 438 (Bankr. M.D. Ala. 2017) ("The Eleventh Circuit has answered this question" [i.e. retroactive imposition of the stay] in *Lashley*).